KINGDOM et, Trustees, Plaintiff, v. SAXBE, Attorney General, Defendant.

Probate Court, Ashtabula County.

No. 38657.   Decided April 10, 1958.

**OPINION**

By PERRY, J.

This is an action for judgment and direction of the court and for

declaratory judgment with respect to the charitable trust created by Item X of the Will of George J. Record. The petition seeks further construction of the will, confirmation and approval of exercise of discretion by the testamentary trustees, and for an order approving a plan devised by the trustees to carry out the testator's general charitable purpose by the application of the equitable doctrines of deviation and, perhaps to some extent, cy pres.

The defendant is the attorney general of the State of Ohio, required by §109.23 ff R. C., as well as by equity practice, to be made a party to the action as the representative of the cestui que trust, namely, the class of indefinite individuals who are the beneficiaries of the charitable trust. See 4 Scott on Trusts, 2nd Ed. p. 2768.

The attorney general is the party charged both at common law and by the Charitable Trust Act, §109.25 R. C., with the enforcement and protection of charitable trusts and uses in the State of Ohio in order that the interests of charitable beneficiaries may be protected and preserved. Sec. 109.25 R. C., reads as follows:

"The attorney general shall be a necessary party to and shall be served with process or with summons by registered mail in all proceedings, the object of which is: (1) To terminate a charitable trust or to distribute its assets to other than charitable donees, or (2) To depart from the objects or purposes of a charitable trust as the same are set forth in the instrument creating the trust, including any proceeding for the application of the doctrine of cy pres, or (3) To construe the provisions of an instrument with respect to a charitable trust. A judgment rendered in such proceedings without service of process upon the attorney general shall be void, unenforceable, and shall be set aside upon the attorney general's motion seeking such relief. The attorney general shall intervene in any proceeding affecting a charitable trust when requested to do so by the court having jurisdiction of the proceeding, and may intervene in any proceeding affecting a charitable trust when he determines that the public interest shall be protected in such proceeding. No compromise, settlement agreement, contract or judgment agreed to by any or all parties having or claiming to have an interest in any charitable trust shall be valid if the compromise, settlement agreement, contract or judgment modifies or terminates a charitable trust unless the attorney general was made a party to all such proceedings and joined in said compromise, settlement agreement, contract or judgment, provided, however, that the attorney general is expressly authorized to enter into such compromise, settlement agreements, contracts or judgments as may be in the best interests of the public."

George J. Record died on or about March 1, 1920, leaving a last will and testament which provides in pertinent part as follows:

ITEM X.

"It has been my intention for many years, should my means prove to be sufficient, to establish a Polytechnic Industrial School to the Glory of God, the Creator of all materials and substances, the central Power and Originator of all energies and forces and the Founder of all arts and sciences, to the end that man may be instructed and enabled to

divine and make use of the materials and apply the forces God has created and that thereby his comprehension may be widened to a full appreciation and understanding of the unlimited preparations and provisions with which his Creator has blessed and surrounded him.

"I am not in sympathy with theoretical religion. Solid facts innumerable are at hand and visible in all directions to be relied upon in formulating the faith and shaping the character, purposes and destinies of man, providing that these truths are properly brought home to man's understanding. To teach the young these facts, to ennoble their purposes, to widen their comprehension of the real meaning of life, to give them a knowledge of their relations to God while learning the arts and sciences of which he is the Author, thus fitting them to meet the world's demands, making them honest in purpose, noble in aspiration, reverent in faith, is the end which I have in view and desire to attain in making the devise set forth in this item of this my Last Will and Testament.

"Therefore I hereby give, devise and bequeath all the remainder of said residue of my said estate left after all the foregoing provisions of this my Last Will and Testament have been fully carried out, to The Guardian Savings and Trust Company of Cleveland, Ohio, and to its successors, in trust, nevertheless, for the purpose of establishing a Polytechnic Industrial School as hereinafter provided.

"Said School shall provide practical education for students of both sexes in the useful arts and sciences and in connection therewith the teachings of the Holy Bible shall be made a prominent feature in bringing to the minds of the young the practical value of following its precepts in the attainment of success in every day life. Said School shall be protestant in ethics and teaching, but otherwise undenominational and shall not exclude from its benefits those of any other faith. It shall be the rule of the School that all students, teachers and officers shall observe the Sabbath Day and attend Sunday School and preaching services and that each session shall be opened with scripture reading from the Bible and with prayer, and all students shall, as a condition to their admission to said School, pledge themselves to faithfully keep and observe these conditions which shall be rules of said School, as well as all other rules consistent herewith which may be formulated for the government of said School.

"My said Trustee shall first offer said remainder of said residue of my said estate to the corporate City of Conneaut, Ohio, to be used in the establishment of said School, on condition that said City shall provide therefor, free of cost to my estate, a suitable and ample site for said School, centrally located, and by the issuance of five (5) per cent bonds provide a sinking fund of One Hundred Thousand Dollars ($100,000.) to be forever maintained to provide income for the support and maintenance of said School, or otherwise secure to said School such fund as will at all times provide said School with an income of Five Thousand Dollars ($5,000.00) per annum. If the foregoing mentioned proposition is not accepted within one year from the date of said offer, then my said Trustee shall make the same offer to the Village of Geneva, in Ashtabula County, Ohio, and if not accepted by said Village within one year

from the date of said offer, or if there be legal obstacles in the way of both said City of Conneaut and said Village of Geneva accepting said legacy for the uses and purposes aforesaid, then and in that event my said Trustee may by forming a corporation or by other lawful means in its discretion to be determined by it, proceed to and complete the organization of said Polytechnic Industrial School, or if it elects so to do may transfer and deliver over the remaineder of said residue of my said estate to some industrial school then well established, to be selected by it for the purpose of carrying out the principles and objects hereinbefore named.

"The School if established either in Conneaut, Ohio, or Geneva, Ohio. shall be known as the 'Record Industrial School' and if said remainder is given to an industrial school already established, it shall be known as 'Record Memorial Industrial Fund' and the department to which it is applied shall be known as the 'Record Memorial Industrial Department' and shall be operated upon the basis and fundamental ideas and to the ultimate end and purpose hereinbefore expressed."

By Item IX of his will, Mr. Record had given a life estate in all of his residuary estate to his widow, Mary J. Record. Mrs. Record, who lived until 1938, made the following disposition of her estate by Item XI of her will:

"All of the residue of my estate of every kind and description and wheresoever situated, of which I die seized or entitled, or over which I have the right of testamentary disposition at the time of my decease, I give, devise and bequeath to the estate of my deceased husband, George J. Record, the same to be disposed of in the same manner as prescribed in his last will and testament for the disposition of the residue of his estate."

After Mrs. Record's death, H. G. Kingdom and Walter L. Findley were duly appointed as trustees under Item X of the will of George J Record and entered into the administration of the trust. George D. Kingdom and Robert W. Halliday are now the duly appointed trustees administering this trust, and they now have in their possession some $1,300,000.

As shown by the petition in the case at bar, this trust estate has been the subject of former litigation. In the initial litigation, which will not be set out here in detail, the rights of the City of Conneaut and the Village of Geneva were determined. These municipal corporations now have no claim or interest in this trust estate. The case of **Findley v. Conneaut, 145 Oh St 480, 31 O. O., 161,** and Case No. 28470, decided in this court in January, 1948, decided this question in regard to the Record trust estate.

Subsequent litigation has terminated both claims made by the heirs at law of George J. Record and by the Prosecuting Attorney of Ashtabula County, Ohio, for the benefit of the common schools.

This court, in case No. 34005, decided in 1954, held that the will of George J. Record, by Item X, created a valid charitable trust for education and, further, that any school which might be selected by the trustees to take this fund, if the trustees should decide upon the so-

called fourth alternative plan, would hold this trust estate in a fiduciary capacity for the purposes expressed by this testator.

Upon appeal to the court of appeals for Ashtabula County, Ohio, that court held, in case No. 517, decided in 1955, that Item X of the will of George J. Record and Item XI of the will of Mary J. Record created valid charitable trusts for educational purposes and that any industrial school which might be selected by the trustees under the provision of Mr. Record's will would take only the legal title as a charitable trustee for the purposes expressed by Mr. Record. The Supreme Court of Ohio, in case Nos. 34622-23, overruled a motion to certify the record.

Thus we have a valid charitable trust for educational purposes, and the corpus of this trust now amounts to some $1,300,000. It is, however, necessary that a plan be adopted in order that the charitable purposes so clearly and specifically expressed by Mr. Record may be accomplished. For this reason, the plaintiff trustees have now initiated the present action, so that they may receive the needed instructions and authorization from this court.

The answer of the attorney general admits the allegations of fact in the petition, and joins in the prayer of the petition.

From January 3, 1948, the trustees sought and received applications and requests from many colleges and universities and other schools to receive the trust fund. Upwards of twenty of those schools and applications were investigated and inspected by the trustees. They included colleges like Baldwin-Wallace, Oberlin College, Youngstown University, Fenn College, Hiram College, Ohio Northern University, and many others. Many of the institutions wanted to use the fund, partially, at least, to build and equip buildings on their campuses. Others asked to receive the fund on the ground that they were, in many ways, the sort of school that Mr. Record had in mind. As a result, the trustees had reached the conclusion that every institution wanting to have the fund planned to use it in one way or another for the accomplishment of its own purposes rather than the testator's purposes, when in the spring of 1952 the George Record heirs made claim to the entire trust fund, claiming that the trust was void.

As a result, the testamentary trustees had to suspend further effort to carry out the 3rd or 4th alternatives, while fighting off an intensely determined effort of the heirs to have the trust declared void. The consequent litigation finally terminated on December 21, 1955, favorable to the trust, although it was not until April 21, 1956, the time for filing certiorari to the United States Supreme Court had expired.

The last-mentioned litigation not only resulted in a definite decision that this was a valid, vested charitable trust, but the court also decided that any school taking the fund under either alternative must take it, not beneficially for its own purposes, but rather as a charitable trustee to administer it exclusively for the testator's charitable purpose.

Soon after the litigation was ended, the trustees made a decision that no well-established, accredited school or college or university was willing to take the fund as charitable trustee under those conditions, and that the trustees would therefore exercise their discretion against employing the 4th alternative at all.

The reasons for that exercise of discretion are as follows:

The testator stated a general charitable purpose in Item X of his will. He first made the observation that "Solid facts innumerable are at hand and visible in all directions to be relied upon in formulating the faith and shaping the character, purpose and destinies of man." He went on to say, "To teach the young these facts, to ennoble their purposes, to widen their comprehension of the real meaning of life, to give them a knowledge of their relations to God while learning the arts and sciences of which He is the Author, thus fitting them to meet the world's demands, making them honest in purpose, noble in aspiration, reverent in faith, is the end which I have in view and desire to attain. . ."

The testator then gave his residue to the testamentary trustees to accomplish that purpose. In order to accomplish it, he prescribed "Practical education for students of both sexes in the useful arts and sciences, and in connection therewith the teachings of the Holy Bible shall be made a prominent feature. . ." He also prescribed teaching that is Protestant in ethics," and required that everyone connected with the teaching—students, faculty and officers—should observe the Sabbath and attend church.

From this language, it is apparent that the testator wanted to furnish the young with a rather special kind of education, a well-balanced college education that included a strong mixture of ethics and reverent religious education so that the recipient would not only be able to take his place in the struggle to make a living, and to realize his full stature, but also to enable him to graps the meaning of life, his relation to the infinite, and to develop faith and nobility of character. Admittedly, such an education runs counter to current popular thinking, yet, such was Mr. Record's general charitable purpose. It is not for us to say, nor do we actually believe, that such a purpose is socially unsound. On the contrary be believe that there is more need for sound religious education now than ever before. Most of our best colleges and universities were founded by men and women of deep religious faith and convictions. Knowledge of the arts and sciences has been rapidly developing during the last few years. Religion and ethics should keep pace with this rapid development to make a well-rounded and properly balanced person. Religion and education must continue on together. Each supplements the other. The one without the other would be disasterous to mankind.

This testator expressed a clear and overriding intention that his residuary estate should be used 'to help young men and women acquire an education. He did not intend, however, that such education include only the liberal arts and sciences, although these were important to him, but he wanted his beneficiaries to receive religious education and training.

It is apparent to the court that though several schools would have taken the fund and operated a department with it, it would still have been merely a department of that school, no different than such department now is, except that it would be given Mr. Record's money and Mr. Record's name. There would not be a separate entity where a group

of students would receive the special treatment, the special mixture of college work and religious education, which is the sine qua non of Mr. Record's purpose.

Mr. Record's general charitable purpose would stand a very poor chance of being carried out by turning the fund over, even in trust, to an existing school, especially when no properly accredited Ohio School had offered faithfully to carry out the trust.

We say "a properly accredited Ohio School" because it is axiomatic that a trustee is always under the direction and guidance of the court and no court is going to appoint a trustee that will come under the jurisdiction of a foreign State, unless the testator himself named a foreign trustee, which in this case he did not do. This court has the right to appoint the trustees who will succeed the testamentary trustees.

Also if this court, for instance, ordered this fund turned over to the applicant Geneva College of Beaver Falls, Pennsylvania, the Pennsylvania Attorney General would replace the Ohio Attorney General as the representative of the cestui que trust.

It is said in 10 American Jurisprudence, 667, that

"Where the body of the trust fund is required to be kept in one jurisdiction and the income expended for the benefit of charity in another, the courts of each state will administer that part of the trust estate that is within its jurisdiction." (Emphasis supplied.)

In other words, if this will required the trustee to be Harvard University, and required Harvard to pay the income to Oberlin College, the Massachusetts court would control the trustee and the Ohio court would control the use of the income by Oberlin. Such a provision in an Ohio will would be accepted and ordered to be executed, because it was the will of the testator. But no Ohio court would thus voluntarily abdicate its jurisdiction over a trust fund if the will did not specifically require it to name a foreign trustee.

It would have been easy for the trustees to have simply handed all of the money over to an existing, well established industrial school, but the money would have been used by such school to further its own purposes and would not have been used to carry out the purposes and intention of George J. Record. The trustees have shown to this court that the fourth alternative would defeat the very desires and purposes of the testator.

The court therefore confirms and approves the exercise of the trustees' discretion not to resort to the fourth alternative. It should be pointed out that these two alternatives are not made consecutive by the testator. In fact, it is made plain by the language used that the trustees were not required to use the 4th unless they "elected to do so."

Having eliminated the 4th alternative, the only thing left which is prescribed by the testator is the 3rd alternative—the formation of a corporation and the organization of the school to carry out the testator's charitable purpose.

But the trustees, as shown by the evidence, have found that there is not sufficient money in the trust fund to found and operate a successful school. The evidence shows that a school of 400 students is the lowest economical unit for a college; that it would cost $4,000,000 to estab-

lish campus, buildings and equipment for a new college of that size; that for a college of even 300 students, the annual cost of operation would be about $220,000 of which only $120,000 could be expected from tuition and fees, leaving a deficient of $100,000 per year.

The evidence shows that the trustees tried to interest a number of colleges of high standing to cooperate with the trustees in organizing and operating a branch at Conneaut which would carry out Mr. Record's purpose, but without success. And the evidence shows that no college of high standing will cooperate with the trustees in operating such a school on its own campus.

Having reached these conclusions, the trustees had come to the end of the road as to carrying out the general charitable purpose by any one of the four methods prescribed by the testator. The next question was, could the general charitable purpose be carried out by a variation in the manner or method? The trustees believed that it could, and have submitted a plan to do so.

The greatest obstacle to the testator's method was the religious angle. No well-established college, one that was financially sound and fully accredited, would think of having on its campus an organization, whether a separate school or a mere department, that required its students, to say nothing of its professors, to go to church, to open each session with prayer, to give teachings of the Bible prominent place in the curriculum. This is fully substantiated by the evidence. Yet the trustees by their survey found that certain prospective students from this section would not spurn an education that contained those requirements. Why shouldn't the burden of taking the religious education, and complying with the religious conditions, be placed upon the individual students, rather than upon the school? Why not let the trust send students to colleges that have a deep Protestant religious heritage and atmosphere, colleges, if possible, that still provide chapel exercises where scripture reading and prayer are had regularly, colleges that provide Bible courses, colleges in towns where there is a wide selection of churches, and then have the trust require the individual students to go to chapel, take the Bible courses, observe the Sabbath, and go to church? In such colleges with a religious background, most of the professors are of high moral character, with a strong religious and ethical background, or they wouldn't be there, and most of them go to church. But if you should try to make it a requirement of one of them, when employing him, that he go to church, there would be trouble. Few would give up their constitutional right to stay in bed any Sunday morning they chose to do so or to play a round of golf and do all of the required teaching and other work, in addition, for the average faculty pay of $6000.00 per year.

We should now give some attention to the legality of the proposed deviation from the exact manner prescribed by the testator for carrying out his charitable purpose.

That there is a definite charitable purpose is not only apparent, but it is the foundation of the court's decision in the case against the heirs. The plan devised by the trustees as above stated, accomplishes

the testator's charitable purpose without altering that purpose in any way. It accomplishes the same purpose by merely changing the manner of operation presented by the testator. This sort of thing is an application of the doctrine of deviation, rather than the doctrine of cy pres.

The doctrine of deviation is described in 4 Scott on Trusts, 2nd Edition, Section 381, as follows:

"The power of a court of equity to permit or direct a deviation from the terms of the trust is at least as extensive in the case of charitable trusts as it is in the case of private trusts. The courts will direct or permit a deviation from the terms of the trust where compliance is impossible or illegal, or where owing to circumstances not known to the settlor and not anticipated by him compliance would defeat or substantially impair the accomplishment of the purposes of the trust. . . .

". . . Moreover in the case of charitable trusts the court has power not merely, as in the case of private trusts, to permit deviations as to matters relating to the administration of the trust, but also as to the purposes of the trust. This power of the court, under the so-called doctrine of cy pres, goes quite beyond anything which is permitted in the case of private trusts."

It is evident from the above that where charitable trusts are involved, it may be difficult to determine in a particular instance just where the remedy used to carry out a charitable trust ceases to be mere deviation and where it starts to be cy pres. In fact, it becomes only of academic interest to try to label the remedy as one or the other.

In this case, it might be said that Mr. Record had a general charitable purpose to educate the young by a combination of college courses and religious training, and that he had a particular charitable purpose to do it by means of a Polytechnic Industrial School.

It is impossible to follow the exact method outlined by the testator to carry out this charitable purpose. It is necessary to deviate somewhat from the exact terms of the will by changing from the operation of a school to the operation of a scholarship foundation in order that Mr. Record's general charitable purpose may be accomplished.

This appears to be a situation in which the doctrine of deviation may and should be applied. It is here suggested that there is nothing in the facts presented in the case at bar which makes it necessary to alter the ultimate purpose expressed by Mr. Record; only the method of accomplishing that fundamental purpose requires variation. This then, would be a situation in which the doctrine of deviation is applicable.

There are many cases cited in the attorney general's Brief in which the doctrines of deviation and of Cy Pres have been applied by Ohio Courts.

We are confronted here with a situation in which the trustees have not been able to carry out this testator's directions to the letter, but his general and overriding intention to provide young people with educational opportunities both in the arts and sciences and in religious education may still be accomplished. Certainly this testator evinced such a broad, general charitable intent that his ultimate purpose may be accomplished under the direction of a court of equity.

The court approves the plan presented by these trustees for providing scholarships and grants-in-aid for young men and women in existing educational institutions as a proper method of carrying out this testator's charitable purpose.

The will of George J. Record, by Item X, vested in his trustees the duty to carry out the purposes he expressed and vested in them certain discretion in so accomplishing these purposes. The plan now proposed appears to be one which will fall within the general framework of this testator's intention.

Whether the court deviates from the method of administration, or whether the court modifies a particular charitable purpose by cy pres in order to assure the carrying out of the general purpose, and to allow the carrying out of the particular purpose as near as possible, the equitable jurisdiction is there in either case. In discussing the doctrine of cy pres, Professor Scott in 4 Scott on Trusts, 2nd Edition, Section 399, page 2824 says,

"The principle under which the courts thus attempt to save a charitable trust from failure by carrying out the **more general purpose** of the testator and carrying out approximately though not exactly his **more specific intent** is called the doctrine of Cy pres. The phrase is in the Anglo-French and is equivalent to the modern **si pres**, meaning so near as or near. The intention of the testator is carried out as nearly as may be." (Emphasis added.)

See also 2A Bogert on Trusts and Trustees, Sections 374 and 436.

It is not necessary, before resorting to deviation or to cy pres, that the particular purpose be absolutely impossible or illegal. The doctrine will be used if the particular purpose, or the manner of administration, is merely impracticable, as is stated in Scott at Section 399.4, as follows:

"In other words, the cy pres doctrine is applicable where it is impracticable to carry out the specific directions of the testator even though it is possible to do so."

The doctrines of cy pres, as well as of deviation, are fully recognized and repeatedly applied by the courts of Ohio. One of the leading cases in Ohio on the subject is **Gearhart v. Richardson, 109 Oh St 418.** Thus, the relief sought by the trustees in the petition, and the plan suggested by the trustees for adoption, are fully authorized by precedent and authority, and by the necessity of our particular situation, and are well within the jurisdiction of this court.

A point that should be stressed as an additional reason for the adoption of this plan is that the corpus of the fund will be preserved, and as heretofore stated may in the future be augmented by gifts of other persons, and by increase in value. Sometime in the future, it may become possible and practicable for the Foundation actually to organize and operate the testator's school at Conneaut. Should that become advisable, a petition to the court could readily terminate the deviation or cy pres application of the fund, and the court later could order the letter of the will to be carried out. If, instead of the solution herein sought, the fund were turned over to some school under the 4th alternative, the possibility of the school being founded in Conneaut would be

16

forever lost. Under the trustee's plan, until that time comes, the purpose of the trust will nevertheless be carried out by the Foundation.

The solution becomes apparent. The general purpose of Mr. Record can be fully accomplished without the slightest modification in that purpose, by the trustees incorporating a Foundation which will receive the entire trust fund in trust.

The court consequently orders that the plaintiffs now proceed to place said fund in the hands of a charitable trustee for the purposes of said trust as herein construed in the following manner:

Said trustees and their counsel, Stephen F. Perry, or their successors, shall as incorporators prepare and file articles of incorporation of this charitable trust in the office of the Secretary of State of Ohio, together with a copy of said will and of this decree, under the provisions of §1719.01 R. C., and of the general non-profit corporation laws of Ohio; the name of said corporation shall be The George J. Record School Foundation; said corporation shall have five trustees; said trustees, after the initial term, shall hold office for the term of five years or until their successors are selected and qualified, and shall be composed of individuals who are in complete belief and harmony with the purposes expressed by said George J. Record in said Item X and as herein interpreted, and who are of high moral character, intelligence and prominent standing, and shall be sworn to carry out said purposes. Said trustees, for the proper and efficient management of said trust shall at all times consist of a lawyer, an industrialist, a financier and an educator and one other person not falling within any of said classifications, and shall be and remain residents of Ashtabula County. And the court does, for the initial term of the members of the board of trustees of said corporation hereby order said incorporators to name the said George D. Kingdom, a lawyer, for the term of five years. Said Robert W. Halliday, an industrialist, for the term of four years. Jerry S. Benson, a person not belonging to any of the other mentioned professions for the term of three years. John C. Soet, a financier, for the term of two years, and J. Allan Pinkerton, an educator, for the term of one year, said respective terms to begin upon the filing of said articles of incorporation, and to end on the 5th, 4th, 3rd, 2nd and 1st annual meetings respectively following the first meeting after incorporation. Said articles of incorporation shall contain the provision that the number of trustees shall be restricted to five, that the board of trustees shall have the qualifications hereinbefore set forth, and that vacancies in the board of trustees caused by death, resignation, incapacity, non-residence of Ashtabula County, or expiration of term shall be filled by majority vote of the remaining members of said board.

Said corporation shall hold said fund in trust to carry out the purposes of the trust set forth in said Item X and as herein interpreted; it shall invest and reinvest said trust fund as provided by law, and shall apply the net income therefrom to carrying out the testator's purposes in the following manner: Said corporation shall select and maintain currently at all times a list of educational institutions teaching the liberal and useful arts and sciences not receiving support from public

taxation, each of said institutions having been found to be well-established and satisfactorily accredited, and the faculties and teachings of which having been found to be under a sound and healthy Protestant religious influence, and near which institutions are located a broad selection of churches and which institutions maintain a regular program of chapel exercises, or where similar services or exercises are easily available.  Said corporation shall grant annual cost-of-education scholarships and grants-in-aid to carefully selected high-school graduates of both sexes on a priority basis, first from Conneaut and vicinity, then from Geneva and vicinity, and then from Ashtabula County and vicinity, selected on the basis of ability and character and such other qualifications as may be determined by said corporation in its regulations as being most apt to result in carrying out the testator's said purpose.  Said corporation shall require each student so selected, as a condition precedent to the payment of such scholarship or grant-in-aid, to obtain admission into one of the institutions currently on said list, and to agree to attend chapel exercises regularly, to take a course wherein the Bible or a part thereof is studied and taught, and to regularly observe the Sabbath and attend church services of such student's choice.  Said corporation shall determine from time to time the approximate per capita cost-of-education (exclusive of board, room, books, clothing and incidental expenses), of each institution on said list, and shall base the amount of each separate scholarship to attend any such institution upon such determination, so that no matter which institution a selected student chooses and enters, his or her cost-of-education for a year will be substantially prepaid  However a maximum amount of such cost should be established from time to time by the corporation.  The corporation shall exercise discretion in choice of institutions allowed to be and remain on the list, not only bearing in mind the excellence of academic standing, but also the per capita cost of education of such institutions, as any excessive cost may affect the number of students who might otherwise receive the benefits of the trust.  Said corporation shall investigate and satisfy itself as to the progress of each student receiving said scholarships or grants-in-aid and as to their performance of said conditions, and, if satisfied that the development of any student is such that the purposes of the trust will be further carried out thereby, it may renew any student's scholarship or grant-in-aid from year to year in the same or other institution on said list up to graduation, and for post-graduate study in exceptional cases of marked development of such student.  While it was not the testator's purpose to furnish said education primarily to the needy, said corporation should have the power, which should be very sparingly and cautiously exercised, to aid needy students who are found to be exceptionally qualified, in order that the benefits of the trust may be made available to exceptional students who might otherwise be eliminated because of financial reasons.  Said corporation shall have power to accept in trust or otherwise for any of the purposes set forth in said will as herein interpreted, or in the articles, donations, gifts, grants, bequests and devises to its capital and income accounts from individuals, corporations, and decedents, said contribu-

tions to be held by said corporation either as separate funds or to become part of said George J. Record fund as directed by the donors thereof. Said corporation shall not expend the corpus of said fund transferred to it by plaintiffs trustees for any purpose, and the income therefrom shall be substantially used for the purposes of the trust and shall not be substantially accumulated. If, in the future, said corporation shall find that the establishment and operation of the school in Conneaut as contemplated by the testator as one of his particular purposes has become practicable and proper, by reason of increase in value or accretion of capital or for any other reason, and said corporation by resolution so finds upon its journal, it shall forthwith apply to a court of competent jurisdiction of this county in a proper action in which the attorney general of the State of Ohio is made party defendant, for authority to amend its charter to include establishment and operation of said school, and to establish and operate the same, if said court finds it proper so to do.

It is further ordered that upon the entry of this decree the plaintiffs shall prepare and file their final account of their trust from the last prior accounting down to the date of the entry of this decree; that upon the incorporation of said The George J. Record School Foundation as above provided, said plaintiffs trustees shall proceed to transfer to said corporation all the securities and funds belonging to said trust in their hands as shown in said final account, in kind, except that they shall retain sufficient funds and securities in their hands to satisfy all claims against the trust estate for costs, administration expenses and other obligations known to the plaintiffs trustees, and shall report their proceedings to this court for confirmation, and shall include in said report an application for allowance of fees and expenses for approval. Upon such confirmation and approval, the decree of confirmation shall include a statement of the payment of said fees and expenses ordered to be paid by the court, together with a statement showing the payment of the full residue in their hands to said corporation, and together with vouchers evidencing such payments, and an order discharging said plaintiffs trustees.

And it appearing to the court that additional fees for legal services will be due, among others, to Stephen F. Perry, of counsel for plaintiffs, the judge of this court, J. Philip Perry, does hereby disqualify himself from hearing said report and said motion for confirmation and the same will be heard by the judge of the court of common pleas of a foreign county assigned by the Chief Justice of the Supreme Court.

As a Foundation is to be authorized to carry out the Record trust purposes, there is no reason for restricting its functions to that purpose alone; the Foundation could also well serve as a community trust, analogous to the Cleveland Foundation, and could act as a focus for other charitable giving in the community, thus spreading and diluting the cost of operation of the Foundation. The plaintiffs should be ordered to include such additional powers in the articles of incorporation.

The plan presented to the court in this case was worked out by the plaintiffs with the aid, cooperation and approval of the attorney general.

The trustees have expressed a desire to collaborate fully with the attorney general in each of the steps to be taken under the order of this court, until the report under the order is finally confirmed.